UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SECURED SYSTEMS TECHNOLOGY, INC.,

       Plaintiff      DECISION AND ORDER

-vs-
                 08-CV-6256

FRANK LILL & SON, INC.,

       Defendant
_____

FRANK LILL & SON, INC.,

       Third-Party Plaintiff

-vs-

SHARED SYSTEMS TECHNOLOGY, INC.

       Third-Party Defendant.
_____

APPEARANCES

For Third-Party
Plaintiff Frank Lill
& Son, Inc.:    Martha A. Connolly, Esq.
         Timothy D. Boldt, Esq.
         Ernstrom & Dreste, LLP
         180 Canal View Boulevard, Suite 600
         Rochester, New York 14623

For Third-Party
Defendant Shared
Systems Technology,
Inc.:       Louis A. Modugno, Esq.
         McElroy, Deutsch, Mulvaney & Carpenter, LLP
         1300 Mt. Kemble Ave., P.O. Box 2075
         Morristown, New Jersey 07962-2075

INTRODUCTION

This third-party action arises from a dispute over a construction contract between Plaintiff Secured Systems Technology, Inc. ("Secured") and Defendant Frank Lill & Son, Inc. ("Lill"). Plaintiff and Third-Party Defendant Shared Systems Technology, Inc. ("Shared") are related companies. After Secured sued Lill in this action for breach of contract, Lill asserted a counterclaim against Secured, and a cross-claim against Shared, on the theory that Secured and Shared are alter-egos. Now before the Court is Shared's motion for summary judgment (Docket No. [#89]), seeking a ruling that, as a matter of law, Lill cannot pierce Shared's corporate veil. Lill opposes the application, but has not cross-moved for summary judgment on the "veil piercing" issue. Shared's application is denied.

BACKGROUND

The reader is presumed to be familiar with the Court's prior Decisions and Orders in this action. *See*, Docket Nos. [#30], [#73], [#85]. Unless otherwise noted, the following are the undisputed facts of this case, viewed in the light most-favorable to Lill, the non-moving party. The subject construction work was part of the Bridgeport Harbor Station Project in Connecticut. Stone & Webster Construction, Inc. ("Stone & Webster") was the prime contractor, Lill was a subcontractor, and Secured was a sub-subcontractor.

At all relevant times, Shared was owned by Mrs. Donna DeMartino. Her husband, Frank DeMartino, Sr., was one of Shared's corporate officers. In 1993, Shared was incorporated, and then began to perform construction work, including concrete restoration and fireproofing. See, [#89-3] Canino Aff. ¶ ¶ 2-3. In 1997, Secured was incorporated. Secured was entirely owned by Frank DeMartino, Sr. After it was incorporated, Secured never actually did business for approximately nine years. In 2006, shortly before the

2

events at issue in this case, Mr. DeMartino "activated" Secured, with the intent that Secured would begin performing insulation work that had previously been performed by Shared. See, [#89-3] Canino Aff. ¶ 10.

At some point prior to September 2006, Shared, not Secured, submitted a bid to Lill, to perform work on the Bridgeport Harbor Station Project. However, Shared later decided to structure the bid such that Secured would subcontract with Lill to perform the insulation work, and Secured would sub-contract with Shared to perform any refractory, grouting and concrete work that would be required. Affidavit of Scott Love ("Love Aff.") ¶ ¶ 13-14. The record does not clearly establish whether that decision coincided with the decision to "activate" Secured, which had been dormant since 1997. In September 2006, Secured submitted a revised bid to replace the bid submitted by Shared, although the revised bid contained a reference to Shared, which Secured maintains was a typographical error. *Id*.

On or about January 9, 2007, Lill and Secured executed a purchase order agreement, pursuant to which Secured agreed to install insulation at the project, in exchange for $3,101,725.00. The type-written purchase order, which was prepared by Lill, originally referenced "Shared Systems Technology, Inc.," but Scott Love, who was Secured's Project Manager, and who also worked for Shared, directed that the name "Shared" by replaced by "Secured," so that the purchase order, as executed, was addressed to "Secured Systems Technology, Inc." Answer [#3-2], Ex. 1; Bold Aff. [#100], Ex. SS, Interrogatory 4.

Secured subsequently asked Lill to remove Shared's original bid from the contract documents. In that regard, on January 8, 2007, Love wrote to Lill's employee, Jeffrey Payton, and stated, in pertinent part, "Please remove SST proposal from contract

3

documents and put in place *SECURED SYSTEMS* four page proposal #IN-111 rev2 including clarifications." Love Aff., Ex. A. Shared and Secured both used the initials SST, but in this instance, Love's reference to SST was intended to mean Shared. Payton responded, "The P.O. [purchase order] was written to Secured Systems Technologies so you should be fine." *Id*.

Secured was capitalized primarily with a bank line of credit obtained in 2007, which was initially in the amount of $170,000., and which by the end of 2007 had been temporarily increased to $1.25 million, to allow Secured to complete the project. Bank of America justified the the temporary increase in Secured's line of credit, based upon Shared's creditworthiness:

> We recommend approval for the temporary increase based on the acceptable credit profile of Shared Systems Technology, Inc. and Subsidiaries (SST), which includes Secured Systems Technology (Secured). SST recorded an ORR/FRR [Obligor Risk Rating/Facility Risk Rating] of 6+ as of 6/30/07. The ORR/FRR for Secured Systems Technology (Secured) is also a 6+ and is based on the consolidated SST given the common ownership and management of the two companies.

Canino Aff. [#89-3] Ex. J. Frank DeMartino Sr. and Donna DeMartino also personally guaranteed the increased line of credit for Secured. *Id*. [#89-7] at p. 13.

During 2007, financial disputes arose between Lill and Secured, and in January 2008 Secured left the job site. Lill maintains that Shared breached the agreement by walking off the job before completing its work, and that it incurred damages, as a result of both having to finish Secured's work, and having to correct problems with Secured's already-completed work. Secured counters that all of its work was complete and correct when it left the job, and that Lill breached the agreement by failing to pay monies owed

4

under the agreement.

On June 12, 2008, Secured commenced this action against Lill. On February 5, 2010, Lill amended its Answer [#60] to include a third-party claim against Shared, designated as a counterclaim. Lill alleges that Secured "was operating under the complete dominion and control of [Shared,] an affiliated company, and that [Secured] was otherwise the alter ego of [Shared]." Braggins Aff. [#38] at ¶ 3. In support of this claim, Lill relies on the following facts, of which proof exists in the record: 1) Secured's bid proposal to Lill was on Secured's letterhead, but indicated, at one point in the document, that it was being submitted by Shared, *see* [#38-8] at p. 2 (*see also, id*. at p. 7, referring to Shared in connection with insurance); 2) Secured submitted a change order request to Lill for materials and labor provided by Shared, *see* [#38-9]; 3) Secured used Shared's pre-printed forms to report information concerning the job, *see* [#38-11] & [#38-18]; 4) key employees of Shared, such as Michael Munyon ("Munyon"), Robert Canino ("Canino") and Betsy Holler ("Holler"), performed work for Secured on the project, such as preparing bids and handling accounts receivable, *see*, [#38-12]; 5) Shared and Secured are both controlled by Mr. and Mrs. Frank DeMartino, Sr., and they, along with other companies controlled by DeMartinos, jointly borrowed $3 million together under a promissory note in which they were all designated as a single "contractor," and in which Shared and Secured guaranteed each other's payment [#38-12]; 6) Secured began as a "division" of Shared, and after a year became a separate corporation designed to act as a subcontractor to Shared on jobs requiring insulation and asbestos, for the purpose of protecting Shared from liability, though there was really "no separation" between the two companies, see, [#38-14 ] at pp. 11, 25-27, 33-34, 87-88, 106; 7) employees were moved or "transitioned" between the two

5

companies as needed, see, [#38-14 ] at pp. 11, 25-27, 33-34,87-88, 106; 8) although Secured's project manager, Scott Love, no longer works for either Shared or Secured, he is being paid by Shared to assist Secured in this lawsuit, *see* [#38] at ¶ 31; 9) Frank DeMartino, Sr. described Shared and Secured as being "arms" of each other, see, [#38-15] at pp. 35-36, 62-63, 121;  10) Shared was responsible to Bank or America ("under Bank of America's thumb") for money owed on Secured's line of credit, see, [#38-15] at pp. 35-36, 62-63, 121; 11) Shared and Secured used the same office space, and shared employees such as Canino, who, although technically an employee of Shared, reviewed all contracts for both Shared and Secured, see, [#38-17] at pp. 16-17, 29, 35, 49, 51-52; 12) Robert Gentile, former president and vice-president of Shared, stated that "in his eyes," Shared and Secured "were the same," *see*, [#38-17] at 50; 13) Munyon, an employee of Shared, who was never technically an employee of Secured, nevertheless performed sales work for Secured, including making the estimate for the bid for the subject project, and also routinely reviewed progress reports sent to him by Love, Secured's Project Manager, *see*, [#38-19] at pp. 15, 27-28, 43, 102-103; 14) at a joint meeting of employees of both Shared and Secured concerning the subject project, Frank DeMartino, Sr. personally made the decision to have Secured leave the project, *see*, [#38-19] at pp. 94-95; 15) Frank DeMartino, Jr. was president of Secured for a few months, but understood that his decisions could always be overridden by his father, Frank DeMartino, Sr. [#38-20] at pp. 12-13; 16) as President of Secured, when Frank Demartino, Jr. learned of a problem with a project, he would discuss it with his father, Canino and/or Gentile, all of whom purportedly worked for Shared, to obtain "action, ideas, resolution," see, [#38-20] at p. 45; 17) Frank DeMartino, Sr. owned Secured, but purportedly worked only for Shared, not

6

Secured, *see*, [#38-20] at p. 46; 18) in 2006 and 2007 Shared reported as income money that was actually earned by Secured, *see*, [#38-21] (Saccomanno Valuation Report) at p. 21; 19) Shared and Secured filed separate tax returns, but had combined financial statements, *see*, [#38-22] at p. 10; 20) Frank DeMartino, Sr. had authority to take funds from Shared for his personal use, even though he purportedly had no ownership in the company, and with no requirement that he repay such funds, *see*, Swyers Dep. [#100-1] at pp. 114; and 21) certain employees of Shared had authority to sign contracts on behalf of Secured, see, Swyer's Dep. [#100-1] at pp. 124-125.

Shared's Summary Judgment Motion

On July 1, 2011, Shared filed its motion for summary judgment [#89]. Shared maintains that it was not a party to the contract between Plaintiff and Defendant, and that Defendant's attempt to pierce the corporate veil and hold Shared liable must fail, because Plaintiff and Shared are distinct corporations. On this point, Shared states that under Delaware law[1], to pierce the corporate veil, Defendant would have to show that Plaintiff and Shared operated a single entity and that an overall element of injustice and unfairness exists, which Defendant cannot do. Shared Memo of Law [#89-1]. For example, Shared maintains that it and Secured had separate shareholders and bank accounts, and maintained corporate formalities between the two companies. Additionally, Shared contends that treating Plaintiff and Shared as separate corporations would not result in any unfairness to Defendant, since Defendant was aware that Plaintiff and Shared were separate companies when it contracted with Plaintiff. Alternatively, Shared states that

---

[1]Defendant does not dispute that Delaware law applies to this issue. *See*, Def. Memo of Law [#102] at pp. 9-10.

even if Defendant could pierce the corporate veil, its claims lack merit.

Lill disagrees, and maintains that the admissible evidence actually shows that Secured was nothing more than a facade or segment of Shared.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).

The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*Piercing the Corporate Veil Under Delaware Law*

The parties agree that on this issue, this Court must apply the law of the State of Delaware. It is clear that Delaware law disfavors alter ego claims, and requires a strong showing in order to pierce the corporate veil:

> Persuading a Delaware court to disregard the corporate entity is a difficult task. In order to state a cognizable claim to pierce the corporate veil of the [corporation], plaintiffs must allege facts that, if taken as true, demonstrate the Officers' and/or the Parents' complete domination and control of the [corporation]. The degree of control required to pierce the veil is exclusive domination and control to the point that the [corporation] no longer has legal or independent significance of its own. Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice.

*Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (citations, footnotes and internal quotation marks omitted); *see also, Case Financial, Inc. v. Alden*, Civil Action No. 1184-VCP, 2009 WL 2581873 at *4 (Del. Ch. Aug. 21, 2009) ("Delaware courts take the corporate form and corporate formalities very seriously," impose a "substantial burden" on the party seeking to pierce the corporate veil, and grant such relief only in "exceptional cases."). More specifically,

> [a]n alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. In this analysis, no single factor is dominant. Delaware Courts have built on this analysis and require an element of fraud to pierce the corporate veil.

*Mason v. Network of Wilmington, Inc.*, No. Civ. A. 19434-NC, 2005 WL 1653954 at *3 (Del. Ch. Jul. 1, 2005) (footnotes and internal quotation marks omitted).

The required element of fraud or injustice must involve a misuse of the corporate form resulting in an injury to the party seeking to pierce the corporate veil. *See, In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003) (Holding that to pierce corporate

veil, "fraud or something like it is required," involving misuse "of the corporate form.") (citations omitted). "[T]he hallmarks of that abuse are typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof." *OTR Associates v. IBC Services, Inc.*, 353 N.J.Super. 48, 52, 801 A.2d 407, 409 - 410 (N.J.Super.A.D. 2002). On the other hand, in the absence of such hallmarks, the required "fraud or injustice" is not established merely because the alleged-subsidiary corporation may now be judgment proof. *See, Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954 at *3-4; *see also, Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 530 (D.Del. 2008) ("Delaware courts have held that the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil.") (citation omitted).

Considering all of these factors, the Court finds that there are triable issues of fact that preclude summary judgment. Clearly, there are issues as to whether Shared dominated and controlled Secured. Lill has produced evidence suggesting that Shared and Secured are a single economic entity, with Secured being a mere division of Shared. For example, Lill has raised issues of fact as to whether Shared and Secured observed corporate formalities, and whether Secured's dominant shareholder, Frank DeMartino, Sr., siphoned corporate funds from Shared, despite purportedly having no ownership interest in that company. Lill has also raised an issue of fact as to the element of fraud or injustice, through evidence that Secured was undercapitalized by Shared, which rendered Secured judgment proof and unable to complete the contract.

CONCLUSION

For all of the foregoing reasons, Shared's summary judgment motion [#89] is denied.

SO ORDERED.

Dated: Rochester, New York
October 1, 2012

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge